# REVISED

# UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

No. 96-40241

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GERARDO TORRES, also known as Jerry;
ADALBERTO CIPPLE, also known as Beto;
AGAPITO MONTALVO SILGUERO;
OSCAR BELTRAN,

Defendants-Appellants.

Appeals from the United States District Court
For the Southern District of Texas

June 2, 1997

Before POLITZ, Chief Judge, KING, Circuit Judge, and DUPLANTIER,[*] District Judge.

POLITZ, Chief Judge:

Geraldo Torres, Adalberto Cipple, Agapito Silguero, and Oscar Beltran

appeal their convictions for conspiracy to possess with intent to distribute in

---

[*] Hon. Adrian G. Duplantier, Senior United States District Judge for the Eastern District of Louisiana, sitting by designation.

excess of 1,000 kg of marihuana in violation of 21 U.S.C. § 846. Cipple also appeals his conviction on three counts of possession with intent to distribute in excess of 100 kg marihuana in violation of 21 U.S.C. § 841(b)(1)(B). For the reasons assigned, we affirm.

## BACKGROUND

In the 1980s and early 1990s the Belmontes, a loose organization of family members and acquaintances, operated a drug trafficking conspiracy in south Texas. The Belmontes hired drivers to transport marihuana in trucks disguised as oil company service vehicles. Border patrol checkpoints were avoided by traveling on ranch roads. Because ranch owners frequently locked gates to secure their property, Arnoldo Belmontes asked his associate, Ivo Perez, Jr., for help obtaining keys. Perez introduced Belmontes to Cipple, who knew people with access to the ranches. Cipple introduced Belmontes and Perez to Torres, a ranch worker who agreed to provide the necessary keys. According to their arrangement Belmontes paid a portion of his fee for transporting the marihuana to Perez, who shared the money with Torres.

Cipple assisted the Belmontes family by locating individuals willing to provide access to ranches and by facilitating the shipments. Cipple also worked as a confidential informant for the DEA from 1992 until sometime in 1994 when he refused to testify against an associate. DEA agents testified at trial that although Cipple had given the DEA some information, he failed to tell them about his involvement with the Belmontes family and their use of the ranch

2

roads for the transportation of drugs.

In 1994 border patrol agents and county deputies seized three Belmontes shipments, leading to the arrest of one of the Belmontes brothers and the ultimate demise of the organization. In February 1995 Arnoldo Belmontes was arrested on drug charges and agreed to cooperate with the government. He arranged a May 16, 1995 meeting with Cipple and his associates, Silguero, Beltran, and Jose Luis Belmontes at a warehouse in Starr County, Texas. At this meeting, Belmontes introduced undercover officer Steve Mendoza, who was posing as "Manuel," a Mexican drug trafficker with 4,000 pounds of marihuana to transport. Mendoza audio taped the meeting. Cipple and Silguero insisted that the best way to transport the marihuana was for individuals to carry it in duffel bags around the border check points. The parties discussed moving 300 pounds of marihuana at a time for $65 per pound, with half of the money to be paid up front. Cipple demanded $1,500 as a finder's fee for locating people to carry the drugs.

On May 24, 1995 Cipple, Silguero, Beltran, Belmontes, and Mendoza had another meeting at the Quality Inn in Kingsville, Texas.[1] Silguero assured Mendoza that moving 4,000 pounds of marihuana was possible by stashing a large amount and carrying small loads every other day. Explaining that they were all working together, Beltran told Mendoza that he did not have to be paid

---

[1]This meeting was videotaped by DEA agents, but the sound was unintelligible. The tape was introduced as evidence at trial and Mendoza recounted the events during his testimony.

3

separately.

Cipple met with Mendoza again on August 31 and September 8, 1995. After several subsequent telephone conversations, Mendoza began to suspect that Cipple was aware that he was working under cover. The government suspended the operation and the appellants were later arrested and charged. The jury returned guilty verdicts and they timely appealed their convictions and sentences.

## ANALYSIS

### I. Sufficiency

Cipple, Silguero, and Beltran contend that the evidence is insufficient to support their convictions. Viewing the evidence in the light most favorable to the verdict, we inquire whether a reasonable trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt.[2] In a drug conspiracy trial, the government must prove: (1) the existence of an agreement between two or more persons to violate the narcotics laws; (2) that the defendant knew of the agreement; and (3) that he voluntarily participated in the agreement.[3]

The prosecution need not establish a defendant's agreement by direct evidence--the jury may infer agreement from the circumstances. Although mere presence is insufficient to support an inference of participation in a conspiracy, the

[2]**United States v. Crooks**, 83 F.3d 103 (5th Cir. 1996).

[3]**United States v. Gonzalez**, 76 F.3d 1339 (5th Cir. 1996).

jury may consider presence and association, along with other evidence, in finding that the defendant participated.[4] As the trier of fact, the jury is entitled to weigh the evidence and determine the credibility of witnesses. We must give the jury verdict the benefit of all reasonable inferences. "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt."[5]

### A. Cipple

Cipple contends that the evidence is insufficient to sustain his convictions on the conspiracy charge and the charges for possession with intent to distribute. Viewing the evidence in the light most favorable to the verdict, we find that the prosecution introduced ample evidence to support the verdicts. Cipple introduced Torres to the Belmontes family and Silguero and Beltran to Officer Mendoza. He facilitated the Belmontes' acquisition of keys to the ranch roads. At the May 16 meeting, Cipple requested $1,500 as his fee for finding people to carry Mendoza's marihuana around the border check points and was instrumental in planning the operation.

In a prosecution for possession with intent to distribute, the government must prove that the defendant knowingly possessed a controlled substance with intent to distribute.[6] Possession may be actual or constructive and may be proved by direct

---

[4]**United States v. Chavez**, 947 F.2d 742 (5th Cir. 1991).

[5]**United States v. Maseratti**, 1 F.3d 330, 337 (5th Cir. 1993).

[6]**United States v. Limones**, 8 F.3d 1004 (5th Cir. 1993).

or circumstantial evidence.[7]  Constructive possession is defined as ownership, dominion,  or control over illegal drugs or dominion over the premises where drugs are  found.[8]  At trial several witnesses testified as to Cipple's involvement in the Belmontes' drug trafficking activities.  Because the offenses that formed the basis of the possession with intent to distribute charges occurred while Cipple was a participant in the conspiracy, it was reasonable for the jury to find him guilty.

## B.    Silguero

Silguero maintains that the evidence is insufficient to prove the existence of a conspiracy involving 4,000 lbs of marihuana. He contends that the parties discussed transporting a maximum 900 lbs of marihuana over the course of three days, and never reached a final agreement.  Moreover, he claims the only evidence of his participation in the alleged conspiracy is his attendance at the meetings on May 16 and May 24.  Finally, he maintains that even if a conspiracy did exist, he withdrew after May 1995 and made it clear to the other parties that he was no longer part of any plan.

Viewing the evidence in the light most favorable to the verdict, we conclude that the government presented sufficient evidence to prove the existence of a conspiracy to transport 4,000 lbs of marihuana in 300 lb loads.  Despite his argument to the contrary, Silguero's involvement went beyond mere attendance at the meetings during which the conspiracy was established.  At the May 16 meeting,

---

[7]**United States v. Gardea Carrasco**, 830 F.2d 41 (5th Cir.1987).

[8]**United States v. Thompson**, 700 F.2d 944 (5th Cir.1983).

Silguero agreed with Cipple that it was best to carry the drugs by hand and that it would take only 45 minutes to get around the border check point. When Mendoza asked Silguero, "you will take care of it?," Silguero responded, "I'll be responsible." Mendoza also testified that at the May 24 meeting he asked Silguero whether he could handle 4,000 lbs and Silguero assured him that it was possible by stashing a large amount and carrying small loads every other day. We conclude that the jury had sufficient evidence to find that Silguero participated in the conspiracy.

A defendant is presumed to continue in a conspiracy unless he makes a substantial affirmative showing of withdrawal, abandonment, or defeat of the conspiratorial purpose. The defendant has the burden of proving affirmative acts that are inconsistent with the conspiracy and are communicated in a manner reasonably calculated to reach his coconspirators.[9] Silguero notes that he did not attend any meetings with Mendoza after May 1995. Mendoza testified that at the August meetings it was clear that Silguero would not be moving anything. We have held, however, that mere cessation of activity in furtherance of the conspiracy does not constitute withdrawal.[10] Because Silguero presented no evidence of affirmative acts that were inconsistent with the conspiracy, we must conclude that the jury reasonably could have found that he did not withdraw.

## C. Beltran

Beltran asserts that the prosecution lacked sufficient evidence to convict him

---

[9]**United States v. Vaquero**, 997 F.2d 78 (5th Cir. 1993).

[10]**United States v. Phillips**, 664 F.2d 971 (5th Cir. Unit B. 1981).

of participation in the conspiracy. He maintains that his presence at two meetings during which the conspiracy was discussed does not establish beyond a reasonable doubt that he was a coconspirator.

While it is unnecessary to prove an overt act in furtherance of the conspiracy, we will not "'lightly infer a defendant's knowledge and acquiescence in a conspiracy.'"[11] Evidence that the defendant merely associated with those participating in a conspiracy is insufficient, as is evidence that "only places the defendant in 'a climate of activity that reeks of something foul.'"[12] Circumstantial evidence may be used to show the existence of a conspiracy, but the government must do more than pile inference upon inference to establish a conspiracy charge.[13]

We find that the prosecution presented evidence, which must be deemed as just barely sufficient, from which the jury reasonably could have inferred that Beltan was guilty. The evidence adduced at trial showed that: (1) Beltran was present at the initial meeting on May 16, although he did not speak; (2) at the second meeting Beltran nodded his head during the discussion of transporting drugs; and (3) when Mendoza asked Beltran whether, "I had to pay him as well," Beltran responded in the negative, stating that they were working together. Viewing the evidence in the light most favorable to the verdict, we must conclude that a reasonable jury could have found Beltran guilty of conspiracy.

---

[11] **United States v. Cardenas Alvarado**, 806 F.2d 566, 569 (5th Cir. 1986) (quoting **United States v. Jackson,** 700 F.2d 181, 185 (5th Cir. 1983)).

[12] **Id.** at 569-70 (quoting **United States v. Galvan**, 693 F.2d 417, 419 (5th Cir. 1982)).

[13] **Id.**

## II. Evidentiary Rulings

Torres and Silguero challenge several of the district court's evidentiary rulings. In general, the trial court has broad discretion in its decisions to admit evidence. We will not disturb these rulings unless we find an abuse of discretion.[14] If the court abused its discretion, the harmless error doctrine applies and we will not reverse the ruling unless it affects a substantial right of the complaining party.[15]

Torres contends that the court abused its discretion by allowing the prosecution to use a chart purporting to summarize telephone calls made by various members of the conspiracy. He complains that the chart improperly displayed his name next to Leticia Garza's phone number. The witness who testified about the compilation of the chart explained that Torres's name was listed instead of Garza's because they were married, although the phone number was held in Garza's name. The witness admitted that the prosecutor had told her that Garza and Torres were married.

We have held that the use of charts to summarize evidence is permissible as long as the jury is properly instructed.[16] In the instant case, the court instructed the jury:

> What is going to take place now is not evidence. This is what is

---

[14]**United States v. Parks**, 68 F.3d 860 (5th Cir. 1995), *cert. denied*, 116 S. Ct. 825 (1996).

[15]**United States v. Skipper**, 74 F.3d 608 (5th Cir. 1996).

[16]**United States v. Winn**, 948 F.2d 145 (5th Cir. 1991).

called a jury aid. The evidence are the phone records, themselves.
What I assume . . . is that the witness before you analyzed records and then from her analysis then came to certain conclusions. You be very mindful of the fact that what she has compiled in terms of her analysis is not the evidence. The charts are simply there to help you. The evidence . . . is actually what has been presented to you and what has been admitted by way of exhibits.

Torres contends that the court's instruction was inadequate because it did not inform the jurors that they were free to disregard the chart if they found it to be inaccurate.

This argument has no merit. The jury is presumed to follow the instructions given by the court. In the instant case, the court's instruction adequately neutralized any potential prejudice from the use of the chart.

Torres further contends that Leticia Garza's phone records were irrelevant because the government failed to show that he was married to her. Because Torres did not object to the admission of the records during trial, we are limited to reviewing for plain error. We find this argument devoid of merit. The phone records showed that Leticia Garza received approximately 100 phone calls from Ivo Perez, Jr., which is clearly relevant to Torres's participation in the conspiracy. We do not find that admission of these records constitutes plain error affecting Torres's substantial rights.

Silguero maintains that the court erred by allowing the admission of the silent video recording of the May 24 meeting because its prejudicial value substantially outweighed its probative value. He claims that the jury could have concluded that his mere presence at that meeting established his participation in the conspiracy. This argument is without merit. As discussed above, Silguero's involvement in the

10

conspiracy went beyond mere presence at the meetings. We find no abuse of the court's discretion in admitting the video tape.

## III. Sentencing

Silguero and Beltran contend that the district court erred in applying the sentencing guidelines. Both appellants received the minimum sentence of 120 months in prison for their involvement as minor participants in the conspiracy. We review the district court's legal interpretation of the sentencing guidelines *de novo* and its factual findings for clear error.[17]

### A. Silguero

Silguero maintains that he is entitled to reduction in his base offense level by 18 U.S.C. § 3553(f), which allows defendants to avoid the statutory minimum sentence if they meet the criteria set forth in § 5C1.2 of the sentencing guidelines. The court found that Silguero met only four out of the five requirements for this safety valve provision. The element that he did not satisfy requires the defendant to give the government all information and evidence he possesses concerning the offense or offenses that were part of the same course of conduct.

Silguero insists that the government had no reason to believe that he had any additional information to contribute to the investigation. Section 5C1.2 provides that a defendant who has no relevant information to share with the government remains eligible for the safety valve provision. The court found that Silguero had not

---

[17]**United States v. Smallwood**, 920 F.2d 1231 (5th Cir. 1991).

fully cooperated with the government because he refused to discuss the facts of the case with the probation officer and would not share any other information from his history in the drug trade.  During the May 16 meeting, Cipple stated that "Gapo" (Silguero) was owed $14,000 from an earlier deal.

A court's refusal to apply § 5C1.2 is a factual finding that we review for clear error.[18]  We find no evidence to suggest that the court's findings regarding Silguero's willingness to cooperate with the government are clearly erroneous. Silguero maintains that the sentence violated his fifth amendment rights by penalizing him for his decision not to testify at trial.  This argument lacks merit.  We rejected a similar claim in **United States v. Stewart**, in which the defendant argued that § 5C1.2 forced her to work as a government informant.[19]  We observed that although a defendant may receive a more lenient sentence by fully cooperating with the government, she is not compelled to do so.  A defendant is free to refuse that option and accept the statutory sentence under the guidelines.[20]

### B.    Beltran

Beltran contends that the court erroneously held him responsible for 4,000 pounds of marihuana, an amount that he claims was merely "puffing" by the undercover agent.  The amount of drugs for which a defendant is held accountable at

---

[18]**United States v. Edwards**, 65 F.3d 430 (5th Cir. 1995).

[19]93 F.3d 189 (5th Cir. 1996).

[20]*See* **United States v. Arrington**, 73 F.3d 144 (7th Cir. 1996) (holding that requiring a defendant to provide information to get relief under U.S.S.G. § 5C1.2. does not implicate the 5th amendment).

sentencing is a factual finding that we review for clear error.[21]

The sentencing guidelines explain that a coconspirator is accountable for his own conduct and the foreseeable acts of his coconspirators in furtherance of the conspiracy.[22] For sentencing purposes, criminal liability is not the same as relevant conduct. In cases involving controlled substances, an individual is accountable for all quantities with which he was directly involved and all foreseeable quantities within the scope of the criminal activity jointly undertaken. Although Beltran correctly notes that no marihuana actually was delivered in this case, the evidence is sufficient to establish that the appellants conspired to transport a total of 4,000 pounds of marihuana and that Beltran was a member of the conspiracy. For this reason, we cannot conclude that the district court's finding was clearly erroneous.

## CONCLUSION

We must note, however, a bit of disquietude that a government agent working under cover would appear to have nigh unlimited reign to propose any amount of drugs that then ostensibly would become the subject of the conspiracy. Viewed uncritically, that suggested but fictitious quantity could dramatically affect the subsequent sentencing of conspirators. In such instances the district court should inquire whether the suggested amount is realistic and doable and whether the defendant's assent likewise is realistic and capable of performance.. We have

---

[21]**Maseratti**.

[22]U.S.S.G. § 1B1.3(a)(1)(B) & application n.2.

confidence the district courts can and will sort out the real from the imagined and will not be misled by totally fictitious amounts proposed by unduly exuberant undercover officers or agents but will determine a fair, reasonable, and meaningful quantification.

The convictions and sentences of all defendants are AFFIRMED.